**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **VS.** | : | **3:CR-06-020** |
| | : | **(JUDGE VANASKIE)** |
| **SHAHKWON DAVIS** | : | |
| | : | |

**MEMORANDUM**

At issue in this criminal prosecution is whether evidence seized from Defendant

Shahkwon Davis's apartment should be suppressed due to alleged violations of the Fourth

Amendment to the United States Constitution.  Defendant has moved to suppress the evidence

seized from his apartment on the grounds that (1) a warrantless entry into his apartment was

illegal and tainted a subsequently-acquired search warrant, and (2) the search warrant itself

was invalid because it was not supported by probable cause.  (Dkt. Entry 37.)  This Court has

jurisdiction pursuant to 18 U.S.C. § 3231.  For the reasons that follow, Defendant's motion to

suppress will be denied.

**I. BACKGROUND**

   **A. Procedural History**

On January 17, 2006, a federal grand jury in this District returned an eight-count

indictment against Defendant.  (Dkt. Entry 1.)  Specifically, Defendant was charged with three

counts of distribution of cocaine, one count of distribution of cocaine and cocaine base, and one

count of possession with the intent to distribute cocaine, all in violation of 21 U.S.C. § 841(a)(1);

one count of possession with the intent to distribute five (5) grams or more of cocaine base, in

violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(iii); one count of possession of a firearm as

a convicted felon, in violation of 18 U.S.C. § 922(g)(1); and one count of criminal forfeiture of

proceeds from drug distribution activities, pursuant to 21 U.S.C. § 853.  (Id.)

On July 14, 2006, Defendant filed a Motion to Suppress Evidence Seized as the Result

of Illegal Search.  (Dkt. Entry 37.)  Defendant also filed a supporting brief.  (Dkt. Entry 38.)  The

Government filed a response on July 31, 2006.  (Dkt. Entry 40.)  An evidentiary hearing was

conducted on May 3, 2007.  The Government filed a supplemental letter brief on May 11, 2007.

(Dkt. Entry 54.)

**B. Findings of Fact**

1. On October 18, 2005, Thomas Davis, a narcotics detective with the Lackawanna

County District Attorney's Office ("LCDAO"), was contacted by a confidential informant ("CI")

and learned that the CI could purchase cocaine from a black male known as "Shawn" or

"Sean."  (Suppression Hr'g Tr., May 3, 2007, Dkt. Entry 55, at 13, 15.)  The CI reported that

Shawn resided at 814 East Locust Street, Scranton, Pennsylvania ("the Premises").  (Id. at 15;

Aff. of Probable Cause, Search Warrant of Dec. 29, 2005 ("Aff. of Probable Cause"), GX-2, ¶

2.)[1]  The CI also related that Shawn owned a firearm, shoulder holster, and bulletproof vest.

---

[1]"GX-_" refers to the exhibits offered by the Government at the suppression hearing.

(Aff. of Probable Cause ¶ 2.)  Shawn is the Defendant.

2. The CI had provided reliable information to Detective Davis in the past that resulted in numerous arrests and convictions of individuals engaged in the trafficking of controlled substances.  (Id.)

3. Detective Davis has participated in hundreds of narcotics investigations.  (Hr'g Tr. 13.) He has received extensive training relevant to narcotics investigations, including instruction from the Drug Enforcement Administration, Pennsylvania State Police, and Northeast Counterdrug Training Center.  (Aff. of Probable Cause ¶ 1.)

4. On October 18, 2005, Detective Davis set up a controlled purchase of cocaine from Defendant.  The CI telephoned Defendant in the presence of Detective Davis and arranged to purchase an "eight-ball" of cocaine, or approximately 3.5 grams.  (Hr'g Tr. 16.)  The CI and Defendant agreed to meet at the Convenient Mart, located in the 1800 block of Pittston Avenue, Scranton, Pennsylvania, which is less than one mile from the Premises.  (Id. at 16, 34.)  Detective Davis provided the CI with $200 to purchase the cocaine.  (Id. at 16.)[2]

---

[2]The CI was utilized to purchase drugs from Defendant on four separate occasions.  On each occasion, the CI contacted Defendant and, before going to the Convenient Mart, the CI's person and vehicle were searched for contraband and money.  (Hr'g Tr. 17-18, 20-21, 23, 30-31.)  The CI was then provided a specific amount of United States currency, the serial numbers pre-recorded by Detective Davis.  (Id. at 16, 20, 23, 30.)  The CI was followed to the Convenient Mart by Detective Davis and, after the purchase, the CI met Detective Davis at a pre-arranged location, turned over the drugs, and Detective Davis searched the CI's person and vehicle.  (Id. at 18-19, 20, 21-22, 24-25, 31, 32-33.)  Field tests conducted after the transactions confirmed that the substances purchased from Defendant were in fact cocaine and

5. Before the CI contacted Defendant, LCDAO detectives established surveillance at the Premises.  (Id. at 15.)  Shortly after the call was placed, the detectives observed a Cadillac arriving at the Premises.  (Id. at 17.)  The driver, a black male dressed in full camouflage and later identified as the Defendant, exited the Cadillac and entered the Premises.  (Id.)  After a few minutes inside, Defendant exited the Premises and drove away in the Cadillac.  (Id.)  The detectives followed the Defendant to the Convenient Mart.  (Id.)

6. Defendant arrived at the Convenient Mart, where the CI was waiting.  (Id. at 18.)  The CI entered the Cadillac and purchased approximately 2.8 grams of cocaine.  (Id. at 18-19.)

7. Detective Davis and the CI arranged another controlled purchase from Defendant on November 15, 2005.  (Id. at 20.)  The CI called Defendant in Detective Davis's presence, and Defendant agreed to sell $300 of cocaine to the CI.  (Id.)  The CI was to meet Defendant at the Convenient Mart.  (Id.)

8. Before the telephone call was placed, detectives were dispatched to the Premises. From their vantage point outside, the detectives could see through the front door window and observed a set of stairs leading to the second floor.  After the phone call, the detectives observed Defendant and an unknown male walking down the stairs and exiting the Premises. (Aff. of Probable Cause ¶ 3.)  Defendant and the unknown male departed in the same Cadillac that Defendant was seen driving during the first transaction.  (Hr'g Tr. 20.)  The detectives

---

cocaine base.  (Aff. of Probable Cause ¶¶ 2-4.)

followed the Cadillac to the Convenient Mart. (Id.)

9. Defendant arrived at the Convenient Mart and entered the CI's vehicle.  (Id. at 21.) The CI purchased $300 of cocaine and cocaine base from Defendant.  (Aff. of Probable Cause ¶ 3.)

10. Detective Davis and the CI arranged a third controlled purchase of cocaine from Defendant on December 21, 2005.  The CI's initial attempt to contact Defendant was unsuccessful.  (Hr'g Tr. 22)  However, the CI eventually received a telephone call from Defendant, who told the CI to meet Defendant at the Convenient Mart.  (Id. at 22-23.)

11. Detectives were once again dispatched to the Premises to conduct surveillance.  (Id. at 23.)  After Defendant called the CI, the detectives observed a Toyota Scion, driven by Defendant, arrive at the Premises.  (Id.)  Defendant, wearing blue jeans and a long black leather jacket, entered the Premises, exited a few minutes later, and then drove the Toyota Scion to the Convenient Mart as he was followed by detectives.  (Id. at 23-24; Aff. of Probable Cause ¶ 4.)

12. Defendant arrived at the Convenient Mart, where he was met shortly thereafter by the CI.  (Hr'g Tr. 24)  The detectives witnessed Defendant, wearing the long black leather jacket, enter the CI's vehicle.  (Id.)  The CI purchased approximately four (4) grams of cocaine for $300.  (Id. at 25; Aff. of Probable Cause ¶ 4.)

13. Also on December 21, 2005, Detective Davis met with the owner of the Premises to

gather intelligence about the Premises.  The Premises is a two-story apartment building with a single apartment on each floor.  The first floor apartment is occupied by a female and her two children.  (Hr'g Tr. 26; Aff. of Probable Cause ¶ 5.)  Other than the fact that they both occupy apartments at the Premises, there is no connection between Defendant and the female occupying the first floor apartment.  (Hr'g Tr. 63.)

14. Detective Davis learned that Defendant resided in the second floor apartment.  (Id. at 26; Aff. of Probable Cause ¶ 5.)  The second floor apartment, however, was not actually rented to Defendant, but instead he moved in with the lessee, Amy Bellas.  (Hr'g Tr. 26.)  Ms. Bellas subsequently moved out of the apartment, and Defendant continued to reside there – alone – and paid rent to the owner each month in the form of a Convenient Mart money order. (Id. at 26-27.)  The name on each money order was "Shahkwon Davis."  (Id. at 27; Aff. of Probable Cause ¶ 5.)

15. Defendant's apartment may be accessed only through the front door of the Premises and then by ascending a flight of stairs to the second floor.  (Hr'g Tr. 27; Aff. of Probable Cause ¶ 5.)  In connection with the November 15, 2005 controlled purchase, the detectives stationed at the Premises observed Defendant and the unknown male walking down this flight of stairs and out the front door on their way to the Convenient Mart.  (Hr'g Tr. 27; Aff. of Probable Cause ¶ 3.)

16. Using the information acquired from the three controlled purchases and the interview

6

with the owner of the Premises, on December 21, 2005, Detective Davis applied for a warrant

to search Defendant's apartment, the Cadillac, the Toyota Scion, and Defendant's person.

(Hr'g Tr. 28; GX-4.)  In the affidavit of probable cause, Detective Davis indicated that he was

contacted by the CI with information regarding Defendant, described each controlled purchase

of drugs from Defendant, noted the observations of the detectives surveilling the Premises, and

summarized the interview with the owner of the Premises.  (GX-4.)

17. Additionally, Detective Davis mentioned the information received from the CI that

Defendant owned a firearm, shoulder holster, and bulletproof vest.  (Id.)

18. The warrant was approved by Magisterial District Judge Robert Russell.  (Id.; Hr'g

Tr. 28.)  The warrant authorized the search for, and seizure of, cocaine and other controlled

substances as well as "monies, records and paraphernalia used in the illegal use of controlled

substances."  (GX-4.)

19. Detective Davis intended to execute the search warrant on the morning of December

22, 2005.  (Hr'g Tr. 29.)  However, the warrant was not executed because Defendant reportedly

went out of town for a few days.  (Id. at 29-30.)

20. On December 29, 2005, Detective Davis and the CI arranged the fourth controlled

purchase of cocaine from Defendant.  The CI telephoned Defendant, who agreed to sell $300

of cocaine to the CI.  (Id. at 30.)  Defendant and the CI planned to meet at the Convenient Mart.

(Id.)  The CI was directed to contact Defendant upon the CI's arrival at the Convenient Mart.

(Aff. of Probable Cause ¶ 6.)  The CI complied with this instruction.  (Hr'g Tr. 31.)

21. Detectives were dispatched to the Premises to conduct surveillance.  (Id. at 30.)
After the CI arrived at the Convenient Mart and telephoned Defendant, the detectives observed
Defendant and another male exit the Premises and drive away in an older model Chevrolet.
(Id. at 31.)  The detectives followed the Chevrolet.  (Id.)

22. En route to the Convenient Mart, Defendant contacted the CI to advise the CI to
meet Defendant down the street at Kelly's Restaurant, rather than the Convenient Mart.  (Id. at
32.)  The detectives maintained surveillance of both the CI and Defendant.  At Kelly's
Restaurant, Defendant was seen entering the CI's vehicle where cocaine was exchanged for
$300.  (Id.; Aff. of Probable Cause ¶ 6.)

23. After the sale, Defendant was followed to the Convenient Mart, where he was
arrested in the parking lot without incident.  (Hr'g Tr. 33-34; see also id. at 33 (in-court
identification of Defendant as the individual arrested).)  Also taken into custody was Fabian
Foster Fields, the unknown male seen leaving the Premises with Defendant.  (Aff. of Probable
Cause ¶ 6.)

24. Defendant was searched incident to the arrest, and the $300 provided to the CI to
purchase cocaine was found in his left front pocket.  (Id.)  Detectives also seized the key to
Defendant's apartment.  (Hr'g Tr. 43.)  Defendant was not carrying a firearm.  (Id. at 68.)

25. The Premises continued to be under surveillance at the time of Defendant's arrest.

8

(Id. at 35.)  Detective Davis was advised that lights were on inside Defendant's apartment, although no one saw any movement inside the apartment.  (Id. at 35, 52.)  Detective Davis surmised that someone may have remained at the apartment when Defendant left to meet the CI.  (Id. at 36.)  Detective Davis was concerned that this individual would destroy evidence either because (1) Defendant failed to return to the apartment within a certain period of time, or (2) the individual would be informed of Defendant's arrest by someone at the Convenient Mart. (Id.)  Detective Davis had no specific information that either of these scenarios would occur. (Id. at 52-53, 55-56.)

26. At the time of Defendant's arrest, there were people inside the Convenient Mart, both employees and customers.  (Id. at 35.)  The detectives did not have any knowledge that these individuals had any connection with Defendant or his illegal activities.  (Id. at 55-56.)

27. The only justification for Detective Davis's concern regarding the destruction of evidence was his experiences in other cases.  (Id. at 60-62.)  Nevertheless, he was genuinely concerned that evidence could be destroyed before a search warrant was issued.

28. After consultation with a Lackawanna County Assistant District Attorney, it was determined that Detective Davis and three other officers would conduct a "protective sweep" of Defendant's apartment in order to prevent the destruction of evidence and to ascertain whether anyone was inside the apartment.  (Id. at 35-36, 42.)  After Defendant's apartment was secure, Detective Davis would then apply for a search warrant.  (Id. at 35-36.)

29. When Detective Davis and the three officers arrived at Defendant's apartment, they knocked on the door, announced their presence, and waited approximately twenty (20) seconds before entering the apartment.  (Id. at 43-44.)  The officers did not hear any sounds emanating from the apartment that would indicate anyone was actually present inside Defendant's apartment.

30. The "protective sweep" was completed within one or two minutes of the officers' entry into the apartment.  (Id. at 39.)  The officers briefly walked through the four rooms of the apartment and the bathroom.  (Id.)  The officers did not find anyone inside the apartment.  (Id.) Beyond this sweep for persons, the officers did not search the apartment.  (Id.)  Once the officers were satisfied that no one else was in the apartment, Detective Davis left to apply for a search warrant.  (Id. at 40.)  Two officers remained just inside the apartment for approximately one hour until Detective Davis returned.  (Id. at 40, 60.)

31. Detective Davis applied for a search warrant on December 29, 2005.  The affidavit of probable cause prepared by Detective Davis included the same information submitted in connection with the December 21 search warrant.  (See Aff. of Probable Cause ¶¶ 1-5.)  For instance, the affidavit related the information learned from the CI about Defendant's ownership of a firearm.  (Id. ¶ 2.)  The only additional information was the December 29 controlled purchase and the circumstances of Defendant's arrest.  (See id. ¶ 6; Hr'g Tr. 41-42.)

32. The affidavit of probable cause did not reference the fact that the officers conducted

10

a "protective sweep," nor did it contain any information gleaned from the protective sweep.

(Hr'g Tr. 69-70.)

33. Based upon his experience and participation in hundreds of narcotics investigations,

Detective Davis knew that it is "common practice" for drug dealers to store evidence of their

activities in their residences.  (Aff. of Probable Cause ¶ 7-f.)  This knowledge, along with a brief

summary of Detective Davis's experience and training, was communicated in the affidavit.  (Id.

¶¶ 1, 7-f.)

34. The December 29 search warrant was approved by Magisterial District Judge

Terrence Gallagher.[3]  (GX-2; Hr'g Tr. 4.)  The search warrant authorized the search for, and

seizure of, the same items authorized in the December 21 search warrant, with the addition of

"any firearms and or [sic] ammunition."  (GX-2; Hr'g Tr. 48.)

35. Although Detective Davis had knowledge that Defendant owned a firearm at the time

he applied for the December 21 search warrant, he forgot to include a firearm in the application.

(Hr'g Tr. 50, 64, 69.)  Realizing the oversight, Detective Davis specified the firearm in the

December 29 search warrant application.  (Id. at 69.)

36. The search warrant was executed immediately after it was approved.  (Id. at 43.)  It

---

[3]In approving search warrants, Magisterial District Judge Gallagher's usual practice is to require the police officer to submit four or five original search warrant applications.  (Hr'g Tr. 5-6.)  If there is probable cause, the search warrant is approved, and Magisterial District Judge Gallagher signs each page of each original application.  (Id. at 6.)  The magistrate adhered to this practice in authorizing the December 29 search.

took the detectives approximately one hour to search Defendant's apartment.  (Id. at 60.)

Among other things, the detectives seized three bags containing 7.6 grams of cocaine base, 7

grams of cocaine, and 1.1 grams of cocaine, respectively, as well as various accoutrements of

illicit drug trafficking, such as two digital scales, three cellular telephones, and empty bags.

(GX-2 (Receipt/Inventory of Seized Property).)

 37. The detectives also seized a loaded handgun and a "black ballistic nylon vest."  (Id.)

The firearm was found between the mattress and the box spring of Defendant's bed in the

master bedroom.  (Hr'g Tr. 57, 67.)  The firearm was not visible without removing the mattress.

(Id. at 67.)

 38. In executing a search warrant, it is customary to search underneath a mattress and,

often, contraband is discovered thereunder.  (Id. at 68.)

 39. The detectives did not see the firearm or the vest during the protective sweep.  (Id.

at 63, 72.)  These items were not discovered until the search warrant was executed.  (Id. at 67-

68, 69.)

## II. **DISCUSSION**

 The Fourth Amendment to the United States Constitution protects the people from

"unreasonable searches and seizures," and requires all warrants authorizing a search to be

issued only "upon probable cause, supported by Oath or affirmation."  U.S. Const. amend. IV.

Evidence seized in violation of the Fourth Amendment may be subject to exclusion.  See, e.g.,

Wong Sun v. United States, 371 U.S. 471, 484-85 (1963); United States v. Coggins, 986 F.2d 651, 653 (3d Cir. 1993).

Defendant's motion to suppress implicates both clauses of the Fourth Amendment quoted above.  First, Defendant contends that the detectives' initial entry into his apartment – without a warrant or his consent – was unreasonable under the Fourth Amendment.  (Def.'s Br. in Supp. of Mot. to Suppress, Dkt. Entry 38, at 4-5.)  Moreover, Defendant argues that the alleged unlawful entry tainted the subsequently-acquired search warrant because information from the entry was utilized in the application for the search warrant.  (Id. at 6; Hr'g Tr. 81.)  As such, Defendant asserts, the evidence seized from his apartment pursuant to the search warrant constitutes fruit of the poisonous tree and must be excluded.

Second, Defendant argues that, even if the detectives' initial entry did not taint the subsequently acquired search warrant, the warrant itself is invalid because it is not supported by probable cause.  (Def.'s Br. in Supp. of Mot. to Suppress 5.)  In this regard, Defendant argues that the affidavit of probable cause does not set forth facts establishing a nexus between Defendant's apartment and his drug dealing activities.  (Id. at 5-6; Hr'g Tr. 82.)

In considering Defendant's arguments, it is unnecessary to decide whether the detectives' warrantless entry into Defendant's apartment, which the Government characterizes as a "protective sweep," was unlawful.  Assuming this entry violated Defendant's Fourth Amendment rights, exclusion of the evidence seized from his apartment is not compelled.  As

the Government correctly observes, the evidence was seized pursuant to an independent source – a valid search warrant – which was not tainted by the initial illegality.  (See Gov't's Resp. to Def.'s Mot. to Suppress, Dkt. Entry 40, at 9; Hr'g Tr. 79.)  Moreover, there was probable cause to believe that contraband would be found at Defendant's apartment, justifying the issuance of the search warrant.  Therefore, Defendant's suppression motion will be denied.

### A. The Independent Source Doctrine

The exclusionary rule proscribes the introduction at trial of tangible evidence seized, and testimony regarding knowledge obtained, during an unlawful search.  Murray v. United States, 487 U.S. 533, 536 (1988).  The exclusionary rule also prohibits the use of evidence derived from the illegally seized evidence or obtained indirectly from an unlawful search.  Id. at 536-37. Nevertheless, the Supreme Court has eschewed reflexive application of the exclusionary rule in all instances of a Fourth Amendment violation.  In this regard, the Court has stated that exclusion of evidence is appropriate "up to the point at which the connection with the unlawful search becomes 'so attenuated [sic] as to dissipate the taint.'"  Id. at 537 (quoting Nardone v. United States, 308 U.S. 338, 341 (1939)); see also United States v. Schaefer, 691 F.2d 639, 644 (3d Cir. 1982).  Where the Government can show that seizure of the challenged evidence resulted from an "'independent source,'" the evidence is purged from the taint of the initial illegality.  United States v. Nelson, 593 F.2d 543, 544 (3d Cir. 1979) (per curiam) (quoting Wong Sun, 371 U.S. at 487); see also Murray, 487 U.S. at 537; Segura v. United States, 468

U.S. 796, 805, 813-14 (1984); Silverthorne Lumber Co. v. United States, 251 U.S. 385, 392 (1920).

In Segura, law enforcement agents arrested a couple who had just purchased cocaine from the defendant.  468 U.S. at 800.  Given the circumstances, including the late hour of the arrest and the unlikelihood of procuring a search warrant that evening, the agents decided to "secure" the defendant's apartment to prevent the destruction of evidence.  Id.  The agents arrived at his apartment, entered without consent, and conducted a limited security check.  Id. at 800-01.  Two agents remained at the apartment until the search warrant was issued approximately nineteen hours later.  Id. at 801.  The Court held that the evidence seized pursuant to the valid search warrant did not have to be excluded as fruit of the illegal entry.  Id. at 813-14.  The search warrant issued was based entirely upon information that was known by the agents prior to the illegal entry and, as such, constituted an independent source.  Id. at 814.

The Supreme Court addressed the independent source doctrine again in Murray, enunciating a two-part test that was implicitly applied in Segura.  In doing so, the Court first expounded the doctrine:

> "[T]he interest of society in deterring unlawful police conduct and the public interest in having juries receive all probative evidence of a crime are properly balanced by putting the police in the same, not a worse, position that they would have been in if no police error or misconduct had occurred.  When the challenged evidence has an independent source, exclusion of such evidence would put the police in a worse position than they would have been in absent any error or violation."

487 U.S. at 537 (quoting Nix v. Williams, 467 U.S. 431, 443 (1984)).  The relevant inquiry, the

Court continued, in determining whether the search warrant is a truly independent source of the

challenged evidence is (1) whether "the agents' decision to seek the warrant was prompted by

what they had seen during the initial entry," and (2) whether the "information obtained during

that entry was presented to the Magistrate and affected his decision to issue the warrant."  Id.

at 542.  If the answer to both of these questions is "no," the search warrant is an independent

source of the challenged evidence, and that evidence can be introduced at trial.  See United

States v. Perez, 280 F.3d 318, 339-40 (3d Cir. 2002); United States v. Herrold, 962 F.2d 1131,

1140-41 (3d Cir. 1992).

In this matter, the decision to apply for the December 29 search warrant was not

prompted by the initial warrantless entry.  First, the decision to apply for the search warrant was

made prior to the warrantless entry.  After Defendant was arrested, Detective Davis was

genuinely concerned that evidence might be destroyed in Defendant's apartment based upon

the report that lights were on inside the apartment.  Detective Davis testified, which the Court

finds credible, that he consulted an assistant district attorney, and it was decided that (1) the

detectives would go to Defendant's apartment to conduct a protective sweep to prevent the

destruction of evidence, and (2) that Detective Davis would apply for a search warrant after

Defendant's apartment was secure.  Thus, the detectives intended all along to seek a search

warrant, and the protective sweep was merely a precautionary measure to guard against

destruction or removal of evidence.[4]  See Herrold, 962 F.2d at 1141 & n.9.

Second, the information available to the detectives just before they carried out the protective sweep was sufficient to establish probable cause to procure a search warrant.  See Segura, 468 U.S. at 814; Perez, 280 F.3d at 340-41; see also Part II-B, infra.  Detective Davis led a two-month investigation into Defendant's drug trafficking activities, which included controlled purchases of drugs by the CI, surveillance of the Premises, and an interview with the owner of the Premises.  Furthermore, the circumstances of Defendant's arrest, especially his possession of the $300 supplied to the CI to purchase drugs, furnished additional probable cause to apply for a search warrant of his apartment.  As probable cause was already established prior to the entry into Defendant's apartment, the warrantless entry did not motivate the decision to apply for a search warrant.

In summary, the Government has presented credible testimony that the warrantless entry into Defendant's apartment did not prompt Detective Davis to apply for the December 29

---

[4]That Detective Davis previously applied for, and obtained, a search warrant for Defendant's apartment on December 21, 2005, confirms that the decision to apply for a search warrant on December 29 was unrelated to the warrantless entry.  While this search warrant was not executed, the affidavit of probable cause submitted in conjunction therewith was used for the December 29 search warrant application.  Because this affidavit was prepared one week earlier, however, it was necessary to arrange a fourth controlled purchase and to arrest the Defendant in order to bolster the probable cause showing and obviate problems of staleness. Cf. United States v. Walton, 56 F.3d 551, 554 (4th Cir. 1995) (police officers' decision to seek a search warrant was not motivated by illegal entry where, inter alia, search warrant affidavit had been prepared prior to illegal entry); United States v. Register, 931 F.2d 308, 311 (5th Cir. 1991) (same).

search warrant.  Therefore, the Court concludes that the answer to the first question of the

Murray test is "no."

The answer to the second question of the Murray test – whether the information

obtained from the warrantless entry was presented to the magistrate and affected his decision

– is also "no."  Like the search warrant applications in Murray and Segura, the application here

did not reference the warrantless entry into Defendant's apartment or any information learned

from that entry.   To the contrary, the affidavit of probable cause included only: (1) the

information reported to Detective Davis by the CI in October 2005 regarding Defendant,

including Defendant's ownership of a firearm; (2) the four controlled purchases of cocaine from

Defendant; (3) the information learned from the interview of the owner of the Premises; and (4)

the circumstances of Defendant's arrest.  Since any information learned from the warrantless

entry was not presented to Magisterial District Judge Gallagher, the warrantless entry could not

affect his decision to issue the search warrant.

In arguing that the warrantless entry tainted the search warrant, Defendant contrasts the

"Items to be searched for and seized" section of the December 21 and 29 search warrants.  In

the December 21 search warrant, the items to be searched for and seized are cocaine and

other controlled substances and "monies, records and paraphernalia used in the illegal use of

controlled substances."  The December 29 search warrant is identical, except for the addition of

"any firearms and or [sic] ammunition."  Defendant also notes that, while Detective Davis

specified the firearm in the December 29 search warrant application, he neglected to mention the bulletproof vest or shoulder holster.  Thus, Defendant contends that Detective Davis added the firearm only because he saw it during the warrantless entry.

Defendant's contention is refuted by Detective Davis's credible testimony.  First, Detective Davis testified that he did not see the firearm during the protective sweep.  Second, Detective Davis testified that he did not include any information regarding the protective sweep in the affidavit of probable cause or the search warrant application.  Third, the omission of the firearm and ammunition from the December 21 search warrant was the result of an oversight. Fourth, Detective Davis was aware of Defendant's ownership of a firearm in October 2005 when he received information from the CI, and this fact was conveyed in both the December 21 and 29 search warrant applications.

Finally, the fact that Detective Davis added only the firearm and not the bulletproof vest and shoulder holster to the search warrant application, when viewed in the context of his entire testimony, does not suggest that he saw the firearm during the protective sweep.  Of the three items, a firearm is clearly the most dangerous, and in the haste to prepare the search warrant application it is reasonable that Detective Davis's focus was finding the firearm.  Therefore, because the addition of the firearms and ammunition was unrelated to the warrantless entry,

the warrantless entry did not taint the search warrant.[5]

In summary, the Government has shown that the December 29 search warrant was an independent source of the evidence seized from Defendant's apartment.  The decision to apply for the search warrant was unrelated to the warrantless entry, and any information concerning the warrantless entry was not presented to the magistrate and, therefore, could not affect his decision to issue the search warrant.  To exclude the evidence seized from Defendant's apartment would serve no purpose other than to put the Government – and the community – in a worse position than had the warrantless entry never occurred.  Accordingly, Defendant's motion to suppress on this basis will be denied.

### B. Probable Cause

Having found the search warrant to be an independent source of the evidence seized from Defendant's apartment, the Court must still decide whether there was probable cause for its issuance.  In reviewing a magistrate judge's determination of probable cause, the Court's inquiry is confined to the four corners of the affidavit.  See Rivera-Pagan, 2007 WL 1030467, at *3 .  Furthermore, the Court is to accord great deference to the magistrate's conclusion, with

---

[5]It is worth mentioning that, although Detective Davis added firearms to the list of items to be searched for and seized, he did not include any additional information regarding firearms in the affidavit of probable cause, the portion of the search warrant application scrutinized by the magistrate in making the probable cause determination.  See United States v. Rivera-Pagan, Crim. A. Nos. 06-592-1, 06-592-2, 06-592-3, 2007 WL 1030467, at *3 (E.D. Pa. Feb. 8, 2007).

the Court's role being limited to "ensur[ing] that the magistrate had a 'substantial basis for . . .

conclud[ing]' that probable cause existed." Illinois v. Gates, 462 U.S. 213, 238-39 (1983)

(quoting Jones v. United States, 362 U.S. 257, 271 (1960)).

In undertaking this deferential review, the Court is mindful of the "totality-of-the-

circumstances" approach to probable cause announced by the Supreme Court in Gates. Id. at

238. Under this "flexible" and "easily applied standard,"

> The task of the issuing magistrate is simply to make a practical, common-
> sense decision whether, given all the circumstances set forth in the affidavit
> before him, including the "veracity" and "basis of knowledge" of persons
> supplying hearsay information, there is a fair probability that contraband or
> evidence of a crime will be found in a particular place.

Id. at 238-39. Additionally, our Court of Appeals has instructed that the magistrate judge is

entitled to give "'considerable weight'" to the conclusions of experienced law enforcement

agents as to where evidence is likely to be found and is entitled "'to draw reasonable inferences

about where evidence is likely to be kept, based on the nature of the evidence and the type of

offense.'" United States v. Whitner, 219 F.3d 289, 296 (3d Cir. 2000) (quoting United States v.

Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996)).

The Third Circuit has discussed the Gates standard with respect to the adequacy of

probable cause to search the residence of a suspected drug dealer. "[D]irect evidence linking

the residence to criminal activity is not required to establish probable cause." United States v.

Burton, 288 F.3d 91, 103 (3d Cir. 2002). "Instead, probable cause to search can be based on

an accumulation of circumstantial evidence that together indicates a fair probability of the presence of contraband at the home of the arrested."  Id.  Moreover, the Third Circuit and other courts of appeals have held that evidence of drug dealing is likely to be found at the dealer's residence because the evidence must be stored somewhere and the dealer's home is likely the best – and only – location.  Id.; United States v. Hodge, 246 F.3d 301, 306 (3d Cir. 2001); Whitner, 219 F.3d at 297-98 (collecting cases).  Nevertheless, this inference is applied only where there is evidence of three supporting premises: "(1) that the person suspected of drug dealing is actually a drug dealer; (2) that the place to be searched is possessed by, or the domicile of, the dealer; and (3) that the home contains contraband linking it to the dealer's drug activities."  Burton, 288 F.3d at 104.

In this matter, Defendant contends that the December 29 search warrant is invalid because the affidavit of probable cause failed to establish a nexus between Defendant's drug trafficking activities and his apartment.  Specifically, Defendant contends there is no direct evidence connecting his apartment to his drug dealing.  However, applying the Third Circuit's teachings in Burton, Hodge, and Whitner, the Court finds that the magistrate had a "substantial basis" to conclude there was a "fair probability" that evidence of drug dealing would be found at Defendant's apartment.

First, the affidavit of probable cause sets forth evidence that Defendant is actually a drug dealer.  The CI, a reliable informant, informed Detective Davis in October 2005 that the CI

could purchase cocaine from Defendant.  Detective Davis confirmed the CI's information by

arranging four controlled purchases of cocaine from Defendant.  In this connection, the CI

purchased $200, $300, $300, and $300 of cocaine, respectively, at each transaction.  "Given

this quantity of narcotics . . ., it was reasonable to infer that [Defendant] was a drug dealer and

not simply a user."  Id.  Additionally, the drug transactions occurred at a pre-arranged location –

the Convenient Mart (or Kelly's Restaurant) – which suggests that Defendant was an

experienced drug dealer.  Accordingly, the affidavit contained ample evidence of Defendant's

status as a drug dealer.

        Second, the affidavit of probable cause sets forth evidence that Defendant resided at

814 East Locust Street.  Detective Davis received information from the CI that Defendant

resided at the Premises.  Like Defendant's status as a drug dealer, Detective Davis's

investigation confirmed that this was Defendant's residence.  For each controlled purchase, the

Premises was under surveillance by detectives.  Shortly after the CI contacted Defendant to

arrange a purchase, Defendant was observed leaving the Premises, entering a vehicle, and

driving to the Convenient Mart.  On two occasions, detectives saw Defendant arrive at

Premises after the phone call, go inside for a few minutes, and then depart for the Convenient

Mart.  Moreover, Detective Davis's interview of the owner of the Premises provided further

corroboration that 814 East Locust Street was Defendant's residence.  Therefore, the affidavit

of probable cause contained abundant evidence that Defendant resided at the Premises.

Third, the affidavit of probable cause sets forth evidence linking the Premises to Defendant's drug dealing activities.  As stated, for each controlled purchase, the detectives observed Defendant leaving the Premises shortly after he was contacted by the CI.  Of even greater significance is the fact that, on two occasions, the detectives saw Defendant arrive at the Premises and go inside before driving to the Convenient Mart, suggesting that Defendant had to obtain the necessary quantity of drugs from the Premises in order to make the sale to the CI.  Defendant's residence was located within a mile of, and in the same city as, the Convenient Mart, "rendering his [apartment] a more likely repository of his drug-related paraphernalia."  Hodge, 246 F.3d at 307.  Moreover, it is undisputed that detectives had probable cause to arrest Defendant for drug dealing, making it more likely that evidence of his illicit activities would be stored in his apartment.  See id.; United States v. Jones, 994 F.2d 1051, 1055-56 (3d Cir. 1993) ("If there is probable cause to believe that someone committed a crime, then the likelihood that that person's residence contains evidence of the crime increases.")  Finally, Detective Davis, who has participated in hundreds of narcotics investigations, stated that it was likely Defendant's apartment would contain evidence of his drug dealing activities.  The magistrate was entitled to defer to the conclusions of an experienced narcotics detective.  See Hodge, 246 F.3d at 307.  Therefore, there is sufficient evidence linking the Premises to Defendant's criminal activity.

In summary, there is a "substantial basis" for the magistrate judge's determination of a

"fair probability" that evidence of Defendant's drug dealing activities would be found in his apartment.  A commonsense assessment of the facts set forth in the affidavit of probable cause demonstrates that Defendant, a drug dealer, stored drug-related paraphernalia at his apartment.  Accordingly, the December 29 search warrant was valid, and Defendant's motion to suppress will be denied.

## III. CONCLUSION

For the reasons stated, Defendant's suppression motion will be denied.  An appropriate Order follows.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **VS.** | : | **3:CR-06-020** |
| | : | **(JUDGE VANASKIE)** |
| **SHAHKWON DAVIS** | : | |
| | : | |

**ORDER**

   **NOW, THIS 16th DAY OF JULY, 2007,** for the reasons set forth in the foregoing

Memorandum, **IT IS HEREBY ORDERED THAT:**

   1. Defendant's Motion to Suppress Evidence Seized as the Result of Illegal Search (Dkt.

Entry 37) is **DENIED.**

   2. Jury selection and trial will commence on **Tuesday, August 28, 2007, at 9:30 a.m.** in

a courtroom to be designated by the Clerk of Court, in the William J. Nealon Federal Building &

U.S. Courthouse, Scranton, Pennsylvania.  Counsel can obtain information on courtroom

assignments by contacting the Clerk's office the Friday before the scheduled appearance.

**s/ Thomas I. Vanaskie**
Thomas I. Vanaskie
United States District Judge
